U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED – SHREVEPORT

JUN 1 1 2013

TONY R. M̶O̶R̶E̶  CLERK
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF LOUISIANA

## SHREVEPORT DIVISION

JOEY REGISTER and LISA
REGISTER  d/b/a J & L FARMS

versus                                    CIVIL ACTION NO. 12-0689
                                          JUDGE TOM STAGG
TYSON FOODS, INC.

## MEMORANDUM RULING

Before the court are three motions for partial summary judgment filed by the

defendant, Tyson Foods, Inc. ("Tyson").  See Record Documents 16-18.  For the

reasons set forth below, Tyson's unopposed motions for partial summary judgment

are **GRANTED**. Tyson's motion for partial summary judgment as to the plaintiffs'

claims for breach of contract is also **GRANTED**.

## I. BACKGROUND

On January 29, 2000, Joey and Lisa Register ("the Registers") purchased a

farm consisting of four poultry houses.  The Registers operated their farms as J &

L Farm #1 and J & L Farm #2.  Each farm had two chicken houses.  When the

Registers purchased the poultry farm, the chicken houses already contained flocks

of Tyson's chickens.  The Registers took over management of the Tyson flocks

mid-way through the flock's cycle.  The Registers contracted with Tyson beginning in 2001.  The contract, entitled "Egg Production Contract," was for the Registers to raise fertilized chicken eggs to be shipped to Tyson hatcheries.  The Registers produced eggs for Tyson from 2001 until August of 2009, when Tyson removed its flocks from the Registers' farm.

Under the terms of the contract, Tyson was to supply the chickens, the feed, technical advice, veterinary services and medication.  The Registers would receive a new flock of chickens at 19 to 21 weeks old (although this would depend more upon the weight of the chicken than the age) and would keep the birds until they were approximately 65 weeks old.  After Tyson would pick up the birds, there was a period of down time, which averaged about six weeks, before Tyson would deliver the next flock of birds.

The Registers contend that Tyson breached its contract with them in a variety of ways, specifically asserting that Tyson failed to:  (1) deliver healthy birds, (2) deliver an adequate number of birds, (3) deliver feed and/or failed to deliver adequate amounts of feed and/or delivered contaminated feed, (4) provide adequate and timely veterinary services and medication, (5) provide adequate technical advice, (6) pick up and transport the eggs in a timely manner, and (7) use its best efforts to maintain the flock in a manner to optimize egg production and

hatchability.  See Record Document 1, Petition at ¶ 10.

In their petition, the Registers also asserted claims for unfair trade practices, tortious interference with a real estate contract, and a claim pursuant to the "Packers And Stockyards Act," 7 U.S.C. § 192.  Record Document 1, Petition.  Thereafter, Tyson filed three separate motions for partial summary judgment as to the Registers' claims.  The first sought dismissal of the Registers' claims pursuant to the Packers and Stockyards Act.  See Record Document 16.  The second motion sought dismissal of the Registers' tortious interference with contract claims.  See Record Document 17.  The third motion sought dismissal of the Registers' claims pursuant to the Louisiana Unfair Trade Practices Act and their claims for breach of contract.  See Record Document 18.

## II.  ANALYSIS

### A.  Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010).  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion,

---

[1]The court notes that amended Rule 56 requires that there be "no genuine **dispute** as to any material fact," but this change does not alter the court's analysis. Fed. R. Civ. P. 56(a) and advisory committee's note (emphasis added).

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). The Fifth Circuit has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the nonmovant's burden in a motion for summary judgment. Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).

**B.     The Registers' Failure To Respond To Two Of The Defendants' Motions.**

The Registers were served copies of the motions for partial summary judgment by Tyson on November 6, 2012. See Record Documents 16, 17 and 18. To date, the Registers have responded to only the motion addressing their breach of contract claims. The Registers have not opposed the two other pending motions or the portion of the third motion pertaining to the Louisiana Unfair Trade Practices

Act.  Local Rule 7.5W requires a respondent opposing a motion to "file a response,

including opposing affidavits, memorandum, and such supporting documents as are

then available, within 21 days after service of the motion."  The Registers failed to

oppose the motion for summary judgment within the required twenty-one day

period.  Federal Rule of Civil Procedure 56 states the following:

> When a motion for summary judgment is properly made
> and supported, an opposing party may not rely merely on
> allegations or denials in its own pleading; rather, its
> response must--by affidavits or as otherwise provided in
> this rule--set out specific facts showing a genuine issue
> for trial.  If the opposing party does not so respond,
> summary judgment should, if appropriate, be entered
> against that party.

Fed. R. Civ. P. 56(e)(2).

The court has been informed by counsel for the Registers that the Registers

do not have any opposition to the dismissal of their unopposed claims.

Accordingly, the court finds it appropriate to enter summary judgment against the

Registers as to all of their claims except for their claims for breach of contract.

Therefore, Tyson's motion for partial summary judgment as to the Registers' claims

pursuant to the Packers and Stockyards Act is **GRANTED**.  See Record Document

16.  Tyson's motion for partial summary judgment as to the Registers' claims for

tortious interference with contract is **GRANTED**.  See Record Document 17.  Tyson's

third motion for partial summary judgment is **GRANTED** to the extent it seeks

dismissal of the Registers's claims pursuant to the Louisiana Unfair Trade Practices

Act. See Record Document 18.

**C.   Breach Of Contract Claims.**

   **1.   Louisiana Contract Law.**

   The only claims remaining before the court are breach of contract claims. The

resolution of contractual disputes is governed by Louisiana law. Louisiana law on

contract interpretation can be summarized as follows:

> We are obligated to give legal effect to contracts according
> to the true intent of the parties. See La. Civ. Code art. 2045.
> The true intent of the parties to a contract is to be determined
> by the words of the contract when they are clear, explicit and
> lead to no absurd consequences. See La. Civ. Code art.
> 2046. When the words of a contract are clear and explicit
> and lead to no absurd consequences, no further interpretation
> may be made in search of the parties' intent. See La. Civ.
> Code art. 2046. In such cases, the meaning and intent of the
> parties to the written contract must be sought within the four
> corners of the instrument and cannot be explained or
> contradicted by parol evidence. See La. Civ. Code art. 1848.
> Contracts, subject to interpretation from the instrument's
> four corners without the necessity of extrinsic evidence, are
> to be interpreted as a matter of law, and the use of extrinsic
> evidence is proper only where a contract is ambiguous after
> an examination of the four corners of the agreement.
> Whether a contract is ambiguous or not is a question of law.

Fleniken v. Entergy Corp., 790 So.2d 64 (La. App. 1st Cir. 2001).

Intent is an issue of fact which is to be inferred from all of the surrounding circumstances.  See Futch v. Futch, 643 So.2d 364 (La. App. 2d Cir. 1994).  When the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity or show the intention of the parties.  See id.

"A contract is ambiguous, under Louisiana law, 'when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.'"  Tex. E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998) (quoting Lloyds of London v. Transcon. Gas Pipe Line Corp., 101 F.3d 425, 429 (5th Cir. 1996)).  Louisiana courts will not interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit. See Makofsky v. Cunningham, 576 F.2d 1223, 1229 (5th Cir. 1978).

### 2.    Pertinent Contract Provisions.

The contracts between the parties provide, in pertinent part:

In consideration of the mutual covenants of the Company [Tyson] and the Producer [the Registers] as set forth below, the parties agree as follows:

7

1. <u>Duties of the Company.</u>

    A.    <u>Hens and Cockerels.</u>   The Company agrees to furnish the Producer with breeding hens and cockerels.   The Company bears the cost of and retains title to the birds.

    B.    <u>Feed.</u>   The Company agrees to provide the Producer with feed to nourish the birds at no cost to the Producer.   The Company will retain title to any feed remaining on the Producer's farm.

    C.    <u>Veterinary Services and Medication.</u>   The Company shall provide veterinary services and prescribed medication as it deems necessary for the production of breeding hens and cockerels.   The Company bears the cost of veterinary services and medication.   The Company will retain title to any medication remaining on the Producer's farm.

    D.    <u>Risk of Loss.</u>   The Company will bear the risk of loss of birds, feed, medication, and eggs while said property is in the Producer's possession.

    E.    <u>Technical Advice.</u>   The Company agrees to provide technical advice at no cost to the Producer.   The Company['s] Technical Advisors shall visit the Producer periodically to give advice and assistance as required.   The Company will provide the Producer with a written guideline of recommended practices that optimizes breeder hen performance, known as the Company's Breeder Egg Production Guide.  This guide is not a guarantee of successful results or profits, but rather contains those management practices that, in the Company's opinion, will prove most effective.

. . .

      G.    <u>Feed Delivery.</u>  The Company will bear the cost of delivering feed to the Producer's farm. The Company will allow the Producer to witness the weighing of said feed.

Record Document 18, Ex. B.  The contracts also contained a provision entitled "Number And Breed Of Hens" which stated: "The Company reserves the right to determine the number, frequency and breed of hens and cockerels to be placed in the Producer's houses." <u>Id.</u>, Ex. B.

### 3.    The Law On Contract Interpretation Applied To The Facts.

#### a.    Healthy Birds And Adequate Birds.

The Registers first contend that Tyson breached the contract by failing to deliver healthy birds. The relevant portions of the contract upon which the breach is based state: "The Company agrees to furnish the Producer with breeding hens and cockerels. . . . The Company reserves the right to determine the number, frequency and breed of hens and cockerels to be placed in the Producer's houses." Record Document 18, Ex. B. The Registers composed their opposition to Tyson's motion for summary judgment by referring to complaints with regard to each year's flock. For example, the Registers first complain that, with regard to the 2002 flock, Tyson "breached its contractual obligations to the Registers by failing to deliver

healthy birds and by refusing to replace the dead birds it had delivered." Record Document 25 at 7. The Registers contend that this flock of birds sat on the delivery truck for an excessive period of time and that, during unloading, over five hundred birds, which were smothered during the move, were dumped out dead on the farm, causing the Registers to have fewer birds to produce. They further assert that the remaining birds, which were stressed by sitting on the truck for an excessive period of time, never performed well. Mr. Register testified in his deposition that he asked Tyson to replace the dead birds, but Tyson refused. See id., Ex. A at 69-70. Mr. Register also admitted, however, that when he asked Tyson to replace the dead birds, the response from Tyson was that it did not "guarantee you a specified number of pullets in each flock." Id., Ex. A at 70.

With regard to the 2005 flock, the Registers contend that there were numerous health issues with the birds, high mortality and reduced production by the birds. The Registers also contend that there was an inadequate number of birds. In 2006, the Registers assert that there was excessive mortality and a loss of production. For 2008, the Registers complain of egg production issues and that Tyson delivered sick, inadequate birds.

Schedule A to the contract provides that "[h]en mortality greater than twenty percent is deemed excessive" and that Tyson agrees to pay an "Excess Mortality

10

Adjustment so long as the mortality is not caused by an Act of God or by poor management by the Producer." Record Document 18, Ex. B, Schedule A.  There is no evidence whatsoever before the court that this provision was invoked and that Tyson thereafter failed to pay.  Beyond this, there is no provision in the contract regarding the health of the chickens, nor does Tyson at any point in the contract promise to deliver perfect chickens.  Lacking an allegation that the excessive mortality provision was invoked and that Tyson thereafter failed to comply, the court cannot find a breach of the contract with regard to any of the allegations with regard to the birds, including an alleged failure to provide healthy birds or an adequate number of birds.

### b.    Feed Issues.

The contract between Tyson and the Registers provided that Tyson "agrees to provide the Producer with feed to nourish the birds at no cost to the Producer." Record Document 18, Ex. B.  Notably, the contract did not specify the amount of feed or set a minimum amount of feed that was to be maintained at the Registers' farm. The Registers allege, inter alia, that the feed supply ran out at one of the four chicken houses and that this caused a sharp drop in the production of eggs.[2]

---

[2]The Registers contend that feed was to be delivered on Thursday.  On Sunday, Mr. Register had no feed to give to the flock in house one and only about 200 pounds for house two.  A Tyson serviceman called Mr. Register Sunday

However, the Registers fail to support with competent summary judgment evidence how this delay resulted in a breach of the contract, which broadly provides that Tyson will "provide" feed to the Registers.

The Registers also allege that Tyson failed to provide adequate amounts of food. As mentioned, there is no contractual provision that addresses amounts of feed to be provided by Tyson.

Finally, with regard to the feed, the Registers assert that they received feed contaminated with "NiCarb" on at least one occasion. To withstand a motion for summary judgment, the plaintiffs must show that there is a genuine dispute of fact by presenting evidence of specific facts. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2511 (1986). There is no competent summary judgment evidence whatsoever that any NiCarb was present in any of the feed provided to the Registers by Tyson, other than Mr. Register's conclusory assertions that the feed contained NiCarb.[3] Conclusory allegations and unsubstantiated

---

morning and allegedly told him that Tyson would deliver feed that day but that he would have to split the delivery with another farmer who was also running low. The feed was ultimately delivered late Sunday evening and production fell from eighty-two percent to sixty percent. See Record Document 25, Ex. A at 106-11.

[3]Mr. Register's statements that he was told by others about alleged NiCarb issues are clearly inadmissible hearsay and will not be considered by the court. Furthermore, the evidence proffered by the plaintiffs to satisfy their burden of proof must be competent and admissible at trial. See Martin v. John W. Stone

assertions will not satisfy the plaintiffs' burden.  See Grimes v. Tex. Dep't of Mental Health, 102 F.3d 137, 139-40 (5th Cir. 1996).

### c.     Veterinary Services And Medication.

The Registers complain that Tyson breached the contract by failing to provide adequate veterinary services and medication.  The contract clearly provides that Tyson "shall provide veterinary services and prescribed medication **as it deems necessary** for the production of breeding hens and cockerels."  Record Document 18, Ex. B (emphasis added).  The contract does not provide for veterinary services when requested by the Registers.  Furthermore, the Registers admit that veterinary services were provided by Tyson.  The Registers complain that there were delays in sending in a veterinarian and medication.  However, and most pertinent to a breach of contract allegation in this regard, there is no allegation that Tyson failed to provide veterinary services and medication as it deemed necessary.  Therefore, this claim must fail.

### d.     Technical Advice.

With regard to technical advice, the contract provides:

The Company agrees to provide technical advice at no cost to the

---

Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987).

> Producer.   The Company['s] Technical Advisors shall visit the
> Producer periodically to give advice and assistance as required.  The
> Company will provide the Producer with a written guideline of
> recommended practices that optimizes breeder hen performance,
> known as the Company's Breeder Egg Production Guide.  This guide
> is not a guarantee of successful results or profits, but rather contains
> those management practices that, in the Company's opinion, will prove
> most effective.

Id.  The plaintiffs do not allege that Tyson failed to visit periodically, nor do the Registers complain that they were not provided with the Breeder Egg Production Guide.  The Registers' complaint simply states that Tyson "fail[ed] to provide *adequate* technical advice."  Record Document 1 (emphasis added).  In fact, the plaintiffs reference numerous visits by Tyson's technical advisors but they complain that, following the visits, Tyson took "no action."  Record Document 25 at 8.  There simply is no provision in the contract that requires Tyson to take "action."

A review of the documents in the record reveal that Tyson sent technical advisors to visit the Registers' farm and that the technical advisors periodically gave advice and assistance.  There are numerous reports provided by the plaintiffs as exhibits in an attempt to show a breach that, in this court's opinion, illustrate, to the contrary.  The reports are written by the technical advisors and indicate that the contract provision regarding technical advice was not breached.  See Record Document 25, Exs. C and D.

14

### e.    Transporting Eggs.

The plaintiffs assert in their complaint that Tyson "fail[ed] to pick up and transport the eggs in a timely manner." Record Document 1. However, the Registers point to no contract provision which was breached by this alleged failure. Furthermore, the Registers make no reference to any specific failure to pick up or transport the eggs in a timely manner.

### f.    Best Efforts.

Finally, the Registers contend that Tyson "fail[ed] to use its best efforts to maintain the flock in a manner to optimize egg production and hatchability." Id. With regard to this allegation, the contract provides that "the Producer and [Tyson] agree to use their best efforts in maintaining the breeder hen flock in such a manner that maximum egg production and hatchability will result." Record Document 25, Ex. 2 at 1.

The contract between Tyson and the Registers nowhere defines "best efforts." The contract was not specific and did not create explicit obligations on the part of Tyson. Tyson sent its technical advisors and veterinarians to service the Registers' flock. It did not guarantee results. The failure to reach the result desired by the Registers is simply not a breach under the terms of the contract and Mr. Register's subjective belief that Tyson should have done more is not sufficient to defeat

15

summary judgment as to this claim or any of the other claims asserted by the

Registers. See Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).[4]

## III. CONCLUSION

Viewing the summary judgment evidence in a light most favorable to the

plaintiffs, the court concludes that no reasonable factfinder could find that Tyson

breached any provision of the contract between it and the Registers.[5]  Accordingly,

Tyson's motions for summary judgment are **GRANTED**. All of the plaintiffs' claims

---

[4]The Registers also repeatedly claim that Tyson breached its obligation to
perform the contract in good faith and that Tyson "violated the overall contractual
obligation of implied warranty" of fitness for intended use.  Record Document 25 at
10.  Although "[g]ood faith performance is an implied requirement of every contract
under Louisiana law," this duty applies only to obligations related to the specific
contractual duties. Innovative Sales LLC v. Northwood Mfg., Inc., 2008 WL
3244114, *4 (5th Cir. Aug. 6, 2008) (quoting Grisaffi v. Dillard Dep't Stores, Inc.,
43 F.3d 982, 983 (5th Cir. 1995)).  See also Jones v. Honeywell Int'l, Inc., 295
F.Supp.2d 652, 672 (M.D. La. 2003) (holding that because the plaintiff "allege[d] a
general obligation unrelated to any contractual duty, she ha[d] not properly stated a
cause of action" for breach of the implied duty of good faith).  As the court in
Innovative Sales stated, "[t]he good faith requirement does not allow a party to read
into a contract additional obligations not contained therein." Innovative Sales, 2008
WL 3244114, at *4.  Furthermore, the Registers have no basis for a claim for an
implied warranty of fitness for intended use.  The contract between Tyson and the
Registers was not a sale.

[5]Tyson also contends that the Registers are unable to show that Mr. Register's
personal estimate of damages is anything more than speculation.  Having concluded
that Tyson did not breach the contract in any manner, the court does not reach this
argument.  The court does, however, note that the Registers took no depositions,
disclosed no expert witnesses, produced no expert report or summary, and provided
no affidavits in support of their opposition to the motion for summary judgment.

against Tyson are **DISMISSED WITH PREJUDICE**.

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DATED AND SIGNED** at Shreveport, Louisiana, this __10th__ day of June, 2013.

JUDGE TOM STAGG